NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Petitioner*,

*v.*

WILLIAM JORDAN, *Respondent*.

No. 1 CA-CR 21-0538 PRPC
FILED 6-9-2022

Appeal from the Superior Court in Yavapai County
No. V1300CR201680129
The Honorable John D. Napper, Judge

**REVIEW GRANTED; RELIEF DENIED**

COUNSEL

Yavapai County Attorney's Office, Prescott
By George D. Rodriguez
*Counsel for Petitioner*

M. Alex Harris P.C., Chino Valley
By M. Alex Harris
*Counsel for Respondent*

---

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Vice Chief Judge David B. Gass and Judge Angela K. Paton joined.

---

**M c M U R D I E**, Judge:

**¶1** The State seeks review of the superior court's order granting William Jordan post-conviction relief ("PCR"). The court vacated Jordan's convictions and sentences and ordered a new trial. Finding the court did not abuse its discretion, we grant review but deny relief.

### FACTS AND PROCEDURAL BACKGROUND

**¶2** On an evening in February 2014, two witnesses drove by a vehicle parked off Fossil Creek Road in Yavapai County. They saw Susan,[1] Jordan's fiancée, urinating by the passenger's side of the vehicle, and another person in the driver's seat, which one witness identified as male. The witnesses later pulled over to read a sign describing a site. Before they proceeded, they saw the vehicle drive past them. The witnesses caught up to the vehicle as it fishtailed and rolled down the mountainside. They pulled over to check on the occupants. When they reached the vehicle, they found Jordan holding Susan, who was seriously injured. One of the witnesses called 9-1-1, but Susan had died when the paramedics arrived. Neither witness saw who drove the vehicle during the accident.

**¶3** Officers arrived at the crash site and located Susan's body and Jordan, who had been placed in an ambulance. The parties stipulated that chemical analysis showed Jordan's blood-alcohol content at .134 percent and Susan's at .19 percent.

**¶4** Officers did not attempt a formal accident reconstruction. They did not measure the distance between the roadway's edge and the vehicle's final resting place. One officer, about Jordan's height, sat in the driver's seat without having to adjust it. They later moved the seat without marking its original position, relying instead on a picture of the officer in the seat.

---

[1] We use a pseudonym to protect the identity of the victim.

¶5        The two witnesses did not tell law enforcement that they saw the vehicle with a male in the driver's seat until the summer of 2015, and law enforcement did not arrest Jordan until February 2016. When the officers questioned Jordan, he said he remembered little of the accident. To obtain a confession, the officers gave Jordan false information, including that the two witnesses who saw him in the driver's seat later saw him driving the vehicle, Susan had a seatbelt injury suggesting she was the passenger, and they collected the DNA of two individuals from the steering wheel. At first, Jordan maintained he did not drive the vehicle, but after an officer said he wanted Jordan's "side of the story" and suggested Jordan had driven because Susan was too intoxicated to drive, Jordan appeared to confirm the officer's version of events. Without saying he had driven the vehicle, he said he had been lying about the crash, and it was his fault Susan died.

¶6        In March 2016, the State charged Jordan with eight felonies: one count of manslaughter (class 2), six counts of aggravated DUI (class 4), and one count of criminal damage (class 5). Two counts of aggravated DUI were later dismissed.

¶7        Jordan's privately retained trial counsel had handled car-accident cases, but those cases did not go to trial, and this was his first vehicular manslaughter case. Trial counsel had hired experts before, but not an accident reconstructionist. Counsel did not retain an accident reconstructionist for Jordan's case. Thus, counsel did not have an expert review the evidence to prepare to cross-examine the State's witnesses or offer trial testimony.

¶8        At the trial, the State introduced testimony from the two witnesses who saw the vehicle before and after the accident, the officers who investigated the scene, and the officers who arrested Jordan. The State's forensic expert estimated that Jordan's blood-alcohol level was between .16 and .22 percent during the accident. Based on Susan's injuries, the pathologist testified that she appeared to have catapulted out of the vehicle because she had several injuries consistent with having been ejected, and there was no blood transfer within the vehicle. The pathologist concluded that the victim was likely in the passenger's seat during the crash because the passenger's side of the vehicle was crushed thus allowing her to be catapulted from the vehicle. But the pathologist testified that she could not say for certain that Susan was not ejected through an open rear window. The pathologist also testified that a person sitting in the passenger seat could not have escaped the accident with only minor injuries no matter when the individual was ejected.

¶9 Trial counsel's cross-examination led officers to admit their limited knowledge of how the crash occurred, the cause of Susan's injuries, or where Jordan and Susan were seated. The jury convicted Jordan on all counts. The court sentenced him to concurrent terms, the longest of which was 17 years.

¶10 Jordan appealed his convictions and sentences. On appeal, he argued there was insufficient evidence that he was driving the vehicle during the accident in part because the State did not use an accident reconstructionist. *State v. Jordan*, No. 1 CA-CR 17-0359, 2018 WL 1598912, at *1, ¶ 6, *3, ¶ 14 (Ariz. App. Apr. 3, 2018). We rejected the argument and affirmed. *Id.* at *3, ¶ 14, *4, ¶ 23.

¶11 Jordan petitioned for post-conviction relief, arguing ineffective assistance of trial counsel. To support his claim, Jordan retained an accident reconstructionist. The accident reconstructionist submitted a preliminary assessment concluding that Jordan was most likely the passenger. As a result, the court granted a hearing on Jordan's claims.

¶12 At the hearing, Jordan's counsel testified that his trial strategy was to point out the lack of physical evidence of Jordan's driving. And he testified that he thought it would be futile to investigate the accident site because of its changed condition by the time he was involved in the case and that such an inquiry may conflict with his theory that the State lacked reliable information based on its investigation.

¶13 Jordan's mother testified that trial counsel had concluded that an accident reconstructionist would be necessary for his case and explained that more funds would be required to retain the expert. Trial counsel admitted that he may not have explained to Jordan the advantages and disadvantages of retaining an accident reconstructionist but recalled that he had cautioned Jordan about the cost. Counsel testified that he did not think he told Jordan that he could receive funds from the court to hire the expert.

¶14 Trial counsel admitted that he did not inquire how to hire an expert in Yavapai County and was unaware that an indigent defendant could retain an expert without notifying the State. The court noted that it was unnecessary to inform the State when obtaining funds for an accident reconstruction expert in Yavapai County and commented that trial counsel did not know that Yavapai County procedure would allow him to retain an expert without the state's knowledge.

¶15  The court granted PCR based on ineffective assistance of counsel. The State petitioned for review. We have jurisdiction under A.R.S. § 13-4239(C) and Arizona Rule of Criminal Procedure 32.16(a)(1).

## DISCUSSION

¶16  A defendant convicted in violation of the United States or Arizona Constitutions has a right to PCR. Ariz. R. Crim. P. 32.1(a). A defendant is constitutionally entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To show ineffective assistance, a defendant must prove that counsel failed to meet an objective standard of reasonableness, which prejudiced the defendant. *Id*. at 687–88. The State only argues that Jordan failed to prove counsel did not meet an objective standard of reasonableness, so we only consider that issue. *See State v. Carver*, 160 Ariz. 167, 175 (1989) (An appellant must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised or the claim is abandoned and waived.).

¶17  We evaluate counsel's reasonableness by examining the "practice and expectations of the legal community, and ask[], in light of all the circumstances, whether counsel's performance was reasonable under prevailing professional norms." *State v. Bigger*, 251 Ariz. 402, 407, ¶ 10 (2021) (quoting *State v. Pandeli*, 242 Ariz. 175, 180, ¶ 5 (2017)). If the inquiry concerns counsel's defense strategy, "[w]e presume counsel acted properly unless a defendant can show that 'counsel's decision was not a tactical one but, rather, revealed ineptitude, inexperience or lack of preparation.'" *Id.* (quoting *State v. Goswick*, 142 Ariz. 582, 586 (1984)). The foundational inquiry is whether counsel had a reasonable basis for the decision. *Id.* at ¶ 11. In general, the decision to hire an expert falls within the realm of trial strategy. *State v. Denz*, 232 Ariz. 441, 445, ¶ 11 (App. 2013). And in some cases, avoiding a "battle of experts" may constitute a sound trial strategy. *Id.* But counsel must engage in an adequate investigation of possible defenses unless a reasonable strategic decision renders a particular investigation unnecessary. *Id.*

¶18  In *Denz*, we reviewed a similar claim of ineffective assistance. 232 Ariz. at 442–43, ¶¶ 1–5. There, trial counsel declined to consult an independent medical expert even though the State introduced expert testimony supporting allegations that the defendant caused a child's injuries. *Id.* at 443, ¶¶ 3–4. In his PCR petition, Denz asserted ineffective assistance of counsel. Denz provided an affidavit by a forensic pathologist who attested that the victim's injuries suggested a fall rather than a blow. *Id.* at 443, ¶ 4. At the PCR hearing, the trial counsel, who had limited

experience with medical testimony or child abuse cases, described a defense strategy of discrediting the prosecution's expert testimony as speculative. *Id.* at 444, ¶¶ 9, 13. Trial counsel expressed trepidation that a retained expert might be discredited at trial. Moreover, introducing more expert testimony would hurt the defendant's case by highlighting "the mode of injury." *Id.* at 444, ¶ 9. But the trial counsel admitted that he did not consult a medical expert. And if he had obtained an expert opinion like that in the defendant's petition, "he would have presented the testimony." *Id.* We noted that counsel acknowledged he could see no downside to consulting an expert before trial. We concluded, "despite its strategic gloss, counsel's decision to not consult with an expert before settling on a defense strategy [was not] a reasoned decision [and] therefore fell below prevailing professional norms." *Id.* at 446, ¶ 19.

**¶19** Like the attorney in *Denz*, Jordan's trial counsel failed to consult an expert before developing his trial strategy. This failure precluded him from determining how much an accident reconstructionist could infer from the available evidence or how favorable the testimony might be even if the State obtained a rebuttal accident reconstructionist.

**¶20** Trial counsel knew that Jordan could not afford an expert but did not request indigent funding. Trial counsel claimed that he did not seek funding because he thought the State would have been put on notice and retained an expert. Such an excuse does not withstand scrutiny and falls below professional norms. When this trial occurred, Rule 15.9 stated that an indigent defendant may apply to have an expert appointed at the county's expense and that, upon showing the need for confidentiality, the request may be made ex parte.[2] *See State v. VanWinkle*, 230 Ariz. 387, 391, ¶ 11 (2012) ("[I]f VanWinkle was concerned about disclosing matters of *trial strategy* or work product, he could have requested an ex parte hearing [under Ariz. R. Crim. P. 15.9(b)]") (emphasis added). In addition, a defendant need not ordinarily disclose a mere consultation with an expert. *See* Ariz. R. Crim. P. 15.2(c)(2). Trial counsel's belief that the court would not permit an ex parte proceeding to obtain expert funding appears to be due to inexperience with criminal practice or caselaw.

**¶21** The State argues the court improperly narrowed the community standard to the county level by considering trial counsel's lack of knowledge about Yavapai County's procedural rules. We disagree. Although the superior court referenced Yavapai County procedure, it also

---

[2] Rule 15.9 was abrogated effective January 1, 2018.

noted that the Arizona Rules of Criminal Procedure did not support trial counsel's concerns about revealing a trial strategy to the State. The court thus did not err.

## CONCLUSION

**¶22** We grant review but deny relief.

